OPINION OF THE COURT
Richard C. Delin, S.
This proceeding to determine the validity of a right of election (EPTL 5-1.1) presents the recurring life situation of a decedent seeking to benefit his first wife and/or children of a prior marriage to the exclusion of his second wife following the disintegration of that marriage.
This is the third in a trilogy of decisions in this proceeding. The first (Matter of Riefberg, NYLJ, March 28,1979, p 15, col 1) overruled the claim that the second wife’s marriage to the decedent was invalid and the second (dated September 13, 1979) dismissed the claim of abandonment by the second wife. Some of the facts established in both those determinations, including reference to matters appearing in the records of this court (Fisch, New York Evidence [2d ed], § 1065) will be referred to here.
The decedent and his second wife Maria were married on September 29,1965 and lived together until 1971. While the *6 marriage was apparently rather stormy and both parties sought its dissolution, such relief was never granted, the parties merely living separate and apart until decedent’s death in 1976. The decedent’s survivors include Rebecca, an infant daughter of the second marriage, and four adult children of his first marriage to Henrietta.
The decedent’s will dated December 4,1967 gives a $500 legacy to Rebecca, one third to Henrietta and the balance to his four adult children, Henrietta being one of the named executors and the only one who has been appointed. Maria is not mentioned.
During his life the decedent and his brother Sam managed a close corporation known as Eastern Warehouse Service, Inc. (Eastern), each owning 50%. This interest is reported to be valued at $250,000 in the proposed New York estate tax return. Other than the corporate interest and life insurance payable to named beneficiaries, the estate’s assets are reported to be less than $8,000.
A buy-sell agreement dated June 10, 1975 obligates Eastern to purchase the shares of any deceased shareholder from “the decedent’s personal representative”, the proceeds thereby becoming estate assets. However, while in a hospital for terminal cancer, the decedent on June 13,1976, one day before his death, together with his brother, executed a handwritten instrument entitled “Amendment of Stockholders Agreement”. The amendment provides for the direct payment by the corporation of the value of the shares in various percentages to Henrietta, the four adult children and a friend.
Maria’s arguments are essentially two: first, that the amendment is an invalid attempt to make a testamentary disposition and second, that the disposition effected by the amendment is a testamentary substitute subject to her right of election (EPTL 5-1.1, subd [b], par [1], cl [E]). While the genuineness of the amendment itself was questioned and a claim made of undue influence, the court is satisfied that it was executed by the decedent, even though he required some assistance, and that at the time he was free from restraint or any undue influence.
*7 As observed in Matter ofHillowitz (22 NY2d 107), many well-recognized commercial transactions, contractual in nature, involve dispositions taking effect at death, but yet need not conform to the requirements of the statute of wills. While the Hillowitz case did not involve a challenge by a surviving spouse, Matter of Crystal (39 NY2d 934), which did, followed the same rational albeit it appears to have blended the question of whether the disposition was an invalid testamentary device with the doctrine of illusory transfers. The dissent in Crystal asserts this blending or confusion was the result of the application of the wrong test of illusoriness: that enumerated in Matter of Halpern (303 NY 33), where the disposition is intrinsically either entirely valid or entirely invalid rather than the Newman v Dore (275 NY 371) approach which obviated the validity question and hinged its determination on the donor’s continued enjoyment or control over the property.
It was particularly because of the confused state of the law on the subject of illusory transfers that the Temporary Commission on Estates (Bennett Commission) sought remedial legislation. “Whichever view may be correct [referring to the controversy over the Halpern and Newman cases], it is universally agreed that the law of New York is in some confusion and that in any event the existing law is inadequate to protect the surviving spouse and that legislation is needed” (Third Report of Temporary Commission on Estates, Report No. 1.5C, p 122; NY Legis Doc, 1964, No. 19, p 122).
Following an analysis of the various devices employed to defeat a surviving spouse’s right of election, the Commission recommended the enactment of five categories of testamentary substitutes in place of the illusory transfer doctrine, which would be nonexempt and subject to the right of election. (Third Report of Temporary Commission on Estates, Report No. 1.5C, pp 123-141.) Only one of those categories, dispositions over which the decedent either alone or with another retained specified powers of control is germane here. This particular category of testamentary substitutes includes: “Any disposition of property made by the decedent after August thirty-first, nineteen hundred *8 sixty-six, in trust or otherwise, to the extent that the decedent at the date of his death retained, either alone or in conjunction with another person, by the express provisions of the disposing instrument, a power to revoke such disposition or a power to consume, invade or dispose of the principal thereof. The provisions of this paragraph shall not affect the right of any income beneficiary to the income undistributed or accrued at the date of death” (EPTL 5-1.1, subd [b], par [1], cl [E]).
Since the buy-sell agreement and its amendment were executed after August 31, 1966 and during the marriage, and the decedent’s will was executed after such date, the disposition may qualify as a testamentary substitute (Arenson, Surviving Spouse’s Right of Election and its Application to Testamentary Substitutes, 20 NY L Forum 1). The executrix however, argues that nowhere in any of the five categories of testamentary substitutes is there mention of a buy-sell agreement.
While there may be some currency for this position it does not withstand analysis. In Matter of Burk (37 Pa D & C 2d 528), the Orphan’s Court of Montgomery County, Pennsylvania, held a buy-sell agreement subject to the widow’s right of election. The Pennsylvania statute acted in part as a model for the present New York statute (Third Report of Temporary Commission on Estates, Report No. 1.10B, pp 225-226) and grants a right of election to “A conveyance of assets by a person who retains a power of appointment by will, or a power of revocation or consumption over the principal thereof” (Pa Cons Stats Ann, tit 20, § 6111, subd [a]). In a comment on the Burk case, the author questions the statute’s application to buy-sell agreements since “its wording seems to limit its applicability to certain types of trusts.” (Buy and Sell Agreements and the Widow’s Rights, 114 Univ of Pa L Rev 1006, 1009.)
That the Bennett Commission considered stock purchase agreements as devices which could defeat a spouse’s election and analogized such situations where the decedent retained control to a trust “in which the decedent retained a life estate or control” is clear from its reports (Third Report of Temporary Commission on Estates, Report No. 1.5C, p 129, *9 ns 96, 97). While certain dispositions were specifically exempted as testamentary substitutes such as “thrift, savings, pension, retirement, death benefit, stock bonus or profit-sharing plan,” life insurance and United States savings bonds payable to a designated person (EPTL 5-1.1, subd [b], par [2]), there is no express exemption of stock purchase agreements or the like.
As emphasized in Matter of Agioritis (52 AD2d 128,135, affd 40 NY2d 646), “The whole purpose of the provisions granting the surviving spouse’s election against the will, or to treat inter vivas transfers as testamentary substitutes, was to defeat the intention of a decedent who did not make adequate provision for his wife.” Statutory language which gives effect to that purpose must be literally construed (Matter of Agioritis, supra, p 135). In view of the fifth category of testamentary substitute’s extension to “[a]ny disposition of property * * * in trust or otherwise” (EPTL 5-1.1, subd [b], par [1], cl [E], italics supplied), the express language of the statute qualifies a stock purchase agreement as a testamentary substitute.
The final question concerns whether any of the prohibited powers of control over the disposition of the shares of stock have been retained by the decedent “either alone or in conjunction with another person” (EPTL 5-1.1, subd [b], par [1], cl [E]). The stock purchase agreement provides that it may be “terminated by mutual agreement of the parties” (art Ninth) which is equivalent to an express power of revocation under the statute. Moreover article First, paragraph (a) permits either of the shareholders to make a gift of any of the shares to immediate family members “subject to the terms of this agreement”, and under paragraph (b) to withdraw as a shareholder and offer all of the shares for sale to the corporation or the remaining shareholder. While this is phrased in terms of an option to purchase by the corporation or remaining shareholder, a failure to exercise such option results in a dissolution. The authority to make gifts or to withdraw from the corporation and sell the shares are the equivalents of a power to dispose or consume the principal, both covered by the statute.
*10 The amendment of 1976, one day before the decedent’s death, is stark confirmation of the continued control the shareholders could and did exercise over the Eastern stock. It was precisely against these forms of will substitutes that the Bennett Commission directed its energies in an effort to give meaning and substance to the right of election (Amend, The Surviving Spouse and the Estates, Powers and Trusts Law, 33 Bklyn L Rev 530, 536). The disposition made of the decedent’s shares in Eastern is held to be a testamentary substitute under EPTL 5-1.1 (subd [b], par [1], cl EE]). For the purpose of determining the elective share, the estate will include the value of the corporate interest in Eastern which testamentary substitute will be required to contribute ratably towards such elective share (EPTL 5-1.1, subd [d], par [2], cl [B]). An exact calculation of the elective share will be determined in the accounting proceeding (Matter of Gerard, 84 Misc 2d 213).